UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number:  07-23205-CIV-MORENO**

BRIGITTE ESPINOZA UGAZ,

       Plaintiff,

vs.

AMERICAN AIRLINES, INC., and MIAMI-
DADE COUNTY d/b/a MIAMI
INTERNATIONAL AIRPORT,

       Defendants.

_____/

## ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Brigitte Espinoza Ugaz, an American Airlines passenger traveling from Peru, fell walking up an inoperable escalator shortly after her flight arrived at the Miami International Airport. As a result, the Plaintiff, who is a surgeon, injured her ankle and proceeded to sue Defendants American Airlines and Miami-Dade County.  American Airlines filed a Motion for Summary Judgment in which the Airport joined for purposes relevant to the disposition of this case.  The Defendants' Motions are **GRANTED**.

At its core, this Order resolves two primary issues: (1) does the Montreal Convention governing international air travel apply and preclude recovery for the Plaintiff, and (2) can the Defendants be held liable for negligence for the injury suffered when the Plaintiff voluntarily ascended a stationary escalator?  The Court rules that the Montreal Convention is the proper law governing the Plaintiff's claims.[1]  Furthermore, the Court finds that recovery is foreclosed because

_____

[1] The Court finds that the Plaintiff waived any argument that the Montreal Convention does not apply when she failed to reply to the Defendants' Response to the Plaintiff's Motion to Remand, in which the Defendants raised the Montreal Convention for the first time.  The Court subsequently ruled that the treaty applied and that the Court

the Plaintiff's injury did not result from an "accident" as defined by the treaty.  Yet, even if there

were an "accident" in this case despite the Plaintiff's failure to plead it, then the Court holds that the

Plaintiff's negligence completely bars recovery.

Furthermore, if the Montreal Convention did not apply at all in this case, recovery is barred

under a theory of negligence.  First, an **inoperable** escalator, standing alone, is not unreasonably

unsafe and there is no evidence that the Defendants had actual or constructive notice of its condition.

Second, the existence of an inoperable escalator does not, standing alone, demonstrate proximate

cause on the part of those responsible for allowing its use.  Third, to the extent that an inoperable

escalator could be considered a hazard at all, the Court finds that it is so "open and obvious" there

this is no duty of care on the part of the Defendants.  Without sufficient evidence to suggest

otherwise, this Court treats a stationary escalator as a set of stairs.  Lastly, the evidence and

contentions in this case indicate that the alleged cause of the injury in question was not unique or

particular to the escalator's immobility, but rather implicates the design of the escalator itself.

Therefore, if there is a cause of action available under these facts, the Court concludes that the claim

would have been more properly raised under products liability law, for which neither named

defendant can be held responsible.

Summary Judgment for the Defendants is **GRANTED** in full.


## I.  PROCEDURAL BACKGROUND

The Plaintiff sued Defendant American Airlines in state court after sustaining injuries on

inoperable escalator at Miami International Airport.  The Plaintiff filed an Amended Complaint

---

had jurisdiction under 28 U.S.C. § 1331.  (See D.E. No. 19.)

(D.E. No. 16) on January 28, 2008, adding Miami-Dade County as a Defendant.  The Plaintiff's Amended Complaint alleges that American Airlines and Miami-Dade County caused her injury by: (1) negligently maintaining the premises (namely, failing to provide an operable escalator, failing to provide adequate lighting,[2] and forcing the Plaintiff to walk on a "dangerous and unsafe" inoperable escalator); (2) negligently breaching a duty to exercise reasonable care by allowing the dangerous and hazardous condition to exist; (3) failing to warn of a hazardous and dangerous condition; and (4) failing to provide reasonable policies, procedures, or training to safeguard against the "foreseeable and known hazard" of an inoperable escalator.

American Airlines removed the case to this Court on December 10, 2007 on the basis of diversity and federal question jurisdiction.  The Plaintiff moved to remand on January 11, 2008 (D.E. No. 10).  The Court subsequently denied the motion to remand on the basis of federal question jurisdiction under the Montreal Convention on January 31, 2008 (D.E. No. 19).  The Defendants raised the issue of the Montreal Convention in their Response to the Plaintiff's Motion to Remand, and the Plaintiff did not file a Reply to the Response; nor did the Plaintiff file a motion to reconsider the Court's application of the Montreal Convention.

On June 16, 2008, Defendant American Airlines filed its Motion for Summary Judgment (D.E. No. 84).  At the same time, American Airlines filed its Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment (D.E. No. 85) and attached five witness deposition transcripts as exhibits (including the Plaintiff's).  Furthermore, on the same day, Defendant Miami-Dade County joined in the Motion for Summary Judgment insofar as it argued against a finding of

---

[2] The Court notes that it was unable to identify any record evidence of inadequate lighting besides Plaintiff's interrogatory answer, which duplicates the language from the Plaintiff's Amended Complaint.  (See D.E. No. 86-5.)

negligence under Florida state law (D.E. No. 88).  On July 10, 2008, the Plaintiff filed her Response and Memorandum in Opposition (D.E. No. 98) and Statement of Undisputed Material Facts in Opposition (D.E. No. 99).  To the latter, the Plaintiff attached duplicate deposition transcripts for several witnesses as well as a receipt for escalator keys.  On July 21, 2008, American Airlines filed a Response to Plaintiff's Statement of Undisputed Material Facts (D.E. No. 102) and its Reply in Support of its Motion for Summary Judgment (D.E. No. 103).  The Defendants' Motions for Summary Judgment are therefore fully briefed.


## II.  FACTUAL BACKGROUND

The Court has exhaustively reviewed the record in this case.  Notwithstanding counsel's tripartite hostility during depositions and their "Who's on First?" Abbott-and-Costello-esque dispute over who possesses what escalator keys, and who is responsible for the seemingly simple task of turning on and off the fateful escalator at Gates 10 and 11, the Court provides the summary of the facts below as presented by the record.

The Plaintiff arrived at Miami International Airport on an international flight from Lima, Peru on May 26, 2006.  (Espinoza Dep. 28:7-24, April 21, 2008.)  She had a rolling, carry-on suitcase that was described as "heavy," as well as a light "laptop-type" bag.  (Espinoza Dep. 31:4-6, 15-17, 36:9-12.)  At the time, the Plaintiff was wearing backless wedge sandals that were five to eight centimeters (or two to three inches) thick at the heel and three to four centimeters thick at the front.  (Espinoza Dep. 32:20-33:4, 115:21-116:5, 116:24-117:9; Stein Reply 2; Janiszewski Dep. 80:24-81:9, May 29, 2008.)  She exited the plane into the "sterile area" and followed other passengers to the inoperable escalator that led to immigration and customs.  (Espinoza Dep. 36:19-

22; see generally Haymes Dep. 28:1-19, May 14, 2008.)  When she arrived at the escalator, the Plaintiff realized that it was not working.  (Espinoza Dep. 36:20-22.)  Passengers behind the Plaintiff urged her to climb the escalator.  (Espinoza Dep. 27:2-6.)  She then chose to ascend the escalator.  (Espinoza Dep. 39:21-23.)  The Plaintiff first attempted to pull her rolling bag up step-by-step.  (Espinoza Dep. 39:21-40:4.)  Between the third to fifth step, she decided to lift it and carry it.  (Espinoza Dep. 41:1-8, 100:15-22.)  In the process of lifting her bag, the Plaintiff fell and was injured.  (Espinoza Dep 41:3-8; see generally Espinoza Dep. at 104-109.)

In addition to the escalator, there were stairs and an elevator that led to immigration and customs; the means of travel were "all conveniently packaged right together."  (Stiles Dep. 97:3-6, May 27, 2008; see also Boone Dep. 30:3-20, May 13, 2008; D.E. No. 56-1.)  There were American Airlines employees outside of the door to the airplane who told the Plaintiff to go to immigration via the "escalera."[3]  (Espinoza Dep. 95:13-20.)  Passengers were not permitted to leave the airport before traveling through immigration and customs directly from the sterile zone.  (Haymes Dep. 28:1-19.)

## III.  STANDARD OF REVIEW

Summary judgment is authorized where there is no genuine issue of material fact.  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598 (1970). The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must establish the essential

---

[3] The Plaintiff stated in her deposition that the employee used the Spanish word, which translates to "stairway" or ladder.  (Espinoza Dep. 149:19-150:9.)  Earlier, the interpreter noted that an escalator is "escalera electrica" in Spanish.  (Espinoza Dep. 94:2-10.)  The record, while not entirely clear, seems to indicate that the Plaintiff was told simply to use the "escalera."

elements of its case on which it will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477

U.S. 317, 322-23, 106 S.Ct. 2548 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 106 S.Ct. 1348 (1986).  The non-movant must present more than a scintilla of evidence

in support of the non-movant's position such that a jury may be able to reasonable find for the non-

movant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986).  "The failure

of proof concerning an essential element of the non-moving party's case necessarily renders all other

facts immaterial and requires the court to grant the motion for summary judgment."  Henderson v.

Carnival Corp., 125 F. Supp. 2d 1375, 1376 (S.D. Fla. 2000).


## IV.  THE MONTREAL CONVENTION

### A.  BACKGROUND

The Montreal Convention entered into force in the United States on November 4, 2003 and

superceded the Warsaw Convention.  See Convention for the Unification of Certain Rules for

International Carriage by Air, art. 55, May 28, 1999, S. Treaty Doc. No. 106-45, 2242 U.N.T.S. 350

(hereafter cited as the "Montreal Convention"); see also Sompo Japan Ins., Inc. v. Nippon Cargo

Airlines Co., Ltd., 522 F.3d 776, 780 -781 (7th Cir. 2008) ("The new treaty 'unifies and replaces the

system of liability that derives from the Warsaw Convention. . . .'") (quoting Ehrlich v. Am.

Airlines, Inc., 360 F.3d 366, 371 n.4 (2d Cir. 2004)). The Montreal Convention governs international

travel and limits liability for carriers such as American Airlines.  Montreal Convention, arts. 1, 17;

cf. Weiss v. El Al Isr. Airlines, Ltd., 433 F. Supp. 2d 361, 364-65 (S.D.N.Y. 2006) ("[T]he Montreal

Convention represents a significant shift away from a treaty that primarily favored airlines to one that

continues to protect airlines from crippling liability, but shows increased concern for the rights of

passengers and shippers.").  Because the Montreal Convention only recently came into force, it is appropriate to rely on cases interpreting the Warsaw convention where the equivalent provision of the Montreal Convention is substantively the same.  See Paradis v. Ghana Airway Ltd., 348 F. Supp. 2d 106, 111 (S.D.N.Y. 2004).

For all air transportation to which the Montreal Convention applies, if an action for damages falls within one the treaty's damage provisions, then the treaty provides the sole cause of action under which a claimant may seek redress for his injuries.  See El Al Isr. Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 176, 119 S.Ct. 662 (1999) (interpreting the Warsaw Convention).  Article 29 of the Montreal Convention states: "In the carriage of passengers . . . **any action for damages, however founded**, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits as are set out in this Convention. . . ."  (Emphasis added).  This language is significant in that it restricts a broader range of recovery than a plaintiff is allowed to seek under the Convention.  Under Article 17, a carrier is liable only for damage sustained when the "accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking."  Montreal Convention, art. 17.

The Supreme Court has specifically ruled that "recovery for a personal injury suffered 'on board [an] aircraft or in the course of any of the operations of embarking or disembarking'. . . if not allowed under the Convention, is **not available at all**."  Tseng, 525 U.S. at 161.  In other words, Article 29 of the Montreal Convention preempts all state law claims that fall within its scope but do not satisfy the conditions for liability under the treaty.  See Tseng, 525 U.S. at 176; see also id. at 173 ("It is improbable that, at the same time the drafters narrowed the conditions of air carrier liability in Article 17, they intended, in Article 24 [of the Warsaw Convention], to permit passengers

to skirt those conditions by pursuing claims under local law."); Paradis, 348 F. Supp. 2d at 111

(S.D.N.Y. 2004) (finding identical preemptive effect as between Article 24(1) of the Warsaw

Convention and Article 29 of the Montreal Convention); Shah v. Pan Am. World Servs., Inc., 148

F.3d 84, 97-98 (2d Cir.1998); Fishman v. Delta Air Lines, Inc., 132 F.3d 138, 141 (2d Cir.1998).

The Eleventh Circuit has deduced three requirements that must be established to satisfy

Article 17: "(1) an **accident must have occurred**; (2) injury or death must have occurred; and (3)

the preceding two conditions must have occurred **while "embarking or disembarking"** or during

the flight itself.  Marotte v. Am. Airlines, Inc., 296 F.3d 1255, 1259 (11th Cir. 2002) (emphasis

added).  Element (2) is not at issue in this case, so the Court will focus its evaluation on elements

(1) and (3).

## B.  REQUIREMENT OF DISEMBARKATION

### i.  What Qualifies as Disembarkation?

To determine if an injury occurred in the operations of embarking (or disembarking), the

Second Circuit set forth a widely-used three-prong test in Day v. Trans World Airlines, Inc., 528

F.2d 31, 33-34 (2d Cir.1975).  The Day test considers: (a) what the plaintiffs were doing (activity);

(b) at whose direction (control); and (c) the location where the injury occurred.  Day, 528 F.2d at 33;

see also Buonocore v. Trans World Airlines, Inc., 900 F.2d 8, 10 (2d Cir.1990) ("[T]he Day analysis

is still the correct one. . . .").  Several other circuit courts, including the Eleventh Circuit, have

endorsed the Day test.  See Marotte, 296 F.3d at 1260 (utilizing the Day test); McCarthy v. Nw.

Airlines, Inc., 56 F.3d 313 (1st Cir. 1995) (same); Evangelinos v. Trans World Airlines, Inc., 550

F.2d 152 (3d Cir. 1977) (*en banc*) (same); Maugnie v. Compagnie Nationale Air France, 549 F.2d

1256 (9th Cir.), cert. denied, 431 U.S. 974, 97 S.Ct. 2939 (1977) (same).  Furthermore, courts have

extended the test to disembarkation. See Alleyn v. Port Auth. of N.Y., 58 F. Supp. 2d 15, 20 n.10 (E.D.N.Y. 1999) (citing Martinez Hernandez v. Air France, 545 F.2d 279, 285 (1st Cir. 1976) (McEntee, J., concurring)); Rabinowitz v. Scandinavian Airlines, 741 F. Supp. 441, 445 (S.D.N.Y. 1990). Florida state courts have also applied the Day test. See, e.g., Bowe v. Worldwide Flight Servs., Inc., 979 So. 2d 423 (Fla. Dist. Ct. App.–3d 2008).

To date, the Supreme Court has not defined the words "embarking" or "disembarking" in the context of Article 17. McCarthy, 56 F.3d at 316. The McCarthy Court opined: "Given the historical record and the signals that the Supreme Court has sent, most courts have interpreted the terms 'embarking' and 'disembarking' to connote a close temporal and spatial relationship with the flight itself." Id. at 316-17. However, the Second Circuit notably eschewed any "strictures on location" and concluded that events transpiring within a terminal building could satisfy the Montreal Convention. Day, 528 F.2d at 33. Additionally, courts also consider the imminence of the passenger's actual boarding of the flight in question. Marotte, 296 F.3d at 1260 (citing Buonocore, 900 F.2d at 10). For disembarkation cases, logic dictates considering how recently a passenger has deplaned.

Definitions of terms of the Montreal Convention that are not defined by the treaty are questions of law to be decided by the courts. See Marotte, 296 F.3d at 1258 (citing Blake v. Am. Airlines, Inc., 245 F.3d 1213, 1215 (11th Cir. 2001)). Thus, it is the job of this Court to determine whether the Plaintiff was in the process of disembarking or not. See Rolnick v. El Al Isr. Airlines, Ltd., 551 F. Supp. 261, 263 (E.D.N.Y. 1982) ("The task of fixing the point at which embarking begins and disembarking concludes . . . devolves upon the courts.").

In Day, the passengers were located in an area exclusively for those about to depart on an

international flight.  Day, 528 F.2d at 33.  They were standing in line at the direction of airline agents who were preparing to search them when they were struck by a terrorist attack.  *Id.*  The passengers were not free agents roaming at will through the terminal.  *Id.*  Therefore, the court ruled that they were in the process of embarking.  *Id.* at 37-38.

Disembarkation cases have reached similar outcomes.  The court in Bunis v. Israir GSA, Inc. applied the Day test to determine that a passenger waiting at the gate for wheelchair assistance satisfied the disembarkation requirement.  511 F. Supp. 2d 319, 322-323 (E.D.N.Y. 2007).  The Court ruled: **"**Applying the Day factors, it is clear that plaintiff was not just in close proximity to the gate but was at the gate having just deplaned (location prong) awaiting the return of and further direction from defendants' employee (activity and control prongs)."  *Id.* at 323.

In Alleyn, a case factually similar to this one, an escalator step collapsed and caused serious injury when one of the plaintiffs' legs became trapped.  58 F. Supp. 2d at 17.  The escalator was located in a non-public, sterile area that led to immigration, was leased and controlled by the airline, and no other passengers were able to mingle with the passengers on the plaintiffs' flight.  *Id.* at 17-18.  The court ruled as follows: "Since Dr. Alleyn's injuries occurred before she had reached the common terminal area, while she was still under the control of [the airline] and acting on its instruction, her accident occurred within the course of disembarking and international flight and is covered by Article 17 . . . ."  *Id.* at 22.

Similarly, in Ricotta v. Iberia Lineas Aereas De España, the area where the plaintiff's injury occurred was not a public portion of the airport and only aircraft passengers, airline staff and airport ground personnel were permitted in the area.  482 F. Supp. 497, 500 (E.D.N.Y. 1979).  The injury also occurred immediately after the plaintiff had descended the steps of the aircraft, but before she

entered any passenger common area. *Id.* She had not proceeded through immigration or customs and had not located her baggage. *Id.* The court found that the plaintiff "was not roaming at will but was within the control of Iberia personnel who were directing passengers to board airport buses owned and operated by Iberia" and ruled that this was covered under Article 17. *Id.*

The plaintiff in Gabra v. Egyptair was injured while walking down a flight of stairs 20 feet away from the aircraft's jetway. Case No. 95 Civ. 9797(LMM), 2000 WL 1473778, at *2 (S.D.N.Y. Oct. 4, 2000). The court found that the plaintiff was not acting as a "free agent" because he was in a "restricted area under the control of Egyptair personnel, not wandering about the safe common areas of the terminal." *Id.* The corridor where the injury took place was designed to limit access and segregate international passengers. *Id.* The court concluded that the plaintiff was in the process of disembarking. *Id.*

### ii. *Application – The Montreal Convention Applies*

As an initial matter, the Court has already ruled that the Montreal Convention applies in this case. (See D.E. No. 19.) Plaintiff's attempts to remove her claims from the purview of the Convention at this late date are unavailing. Nevertheless, to escape the imposition of the treaty, the Plaintiff argues that she was not disembarking at the time of her injury. The Court agrees with the Defendants that she was, in fact, disembarking.

Applying the first prong of the Day test to this case, the Court finds that Plaintiff was injured while ascending an inoperable escalator on her journey from the plane to customs and immigration. Under the second prong, she was doing so under the direction of American Airlines, who maintained the gate area and sterile zone and directed passengers to customs and immigration. Her location (third prong) was on one of the lower steps of the non-moving escalator located in the sterile zone.

She had only recently exited the jetway (or jet bridge).  See Marotte, 296 F.3d at 1260.  There was

a close temporal and spatial relationship with the flight itself.  See McCarthy, 56 F.3d 316-17; Bunis,

511 F. Supp. 2d at 323. The Plaintiff here was not a free agent roaming at will throughout the

terminal, which several other courts have found to be a persuasive factor.  See Day, 528 F.2d at 33.

The circumstances under which the Plaintiff was injured were very similar to Alleyn, where the

plaintiff was also injured in a non-public, sterile area leading to customs and immigration.  See 58

F. Supp. 2d at 17-18.  The Court agrees with the Alleyn Court's determination and finds that the

Plaintiff was in the process of disembarking from her flight.  This ruling is in accordance with

several additional cases.  See Gabra, 2000 WL 1473778, at *2; Ricotta, 482 F. Supp. at 500; Alleyn,

58 F. Supp. 2d at 21; Lyons v. Am. Trans Air, Inc., 231 A.D.2d 689, 690 (N.Y. App. Div. 1996)

("Lyons was not free to move about the terminal, nor was she in a common public area.  Rather, she

was being escorted by airline personnel to customs, a necessary step in the disembarking process.").

The Plaintiff wishes to apply a stricter interpretation of the Montreal Convention than that

upon which the drafters ultimately agreed.[4]  To that end, the Plaintiff attempts to rely on McCarthy,

56 F.3d 313, Martinez Hernandez, 545 F.2d 279, and MacDonald v. Air Canada, 439 F.2d 1402 (1st

Cir. 1970).  In McCarthy, the Montreal Convention did not apply because the plaintiff was located

in an unrestricted, public part of the terminal a considerable distance from the plane, "well before

any actual embarkation was possible."  56 F.3d at 318.  In Martinez Hernandez, the court applied

the Day test and found that the plaintiffs did not satisfy any of the elements because: (1) the plaintiffs

_____

[4] The Warsaw Convention was a compromise between parties, on the one hand, who wanted to extend liability for passengers from the moment they enter the airport of departure until they exit the airport of arrival and, on the other hand, parties who wanted to restrict liability solely to those passengers located inside an aircraft.  See Day, 528 F.2d at 34-35.  The Warsaw delegates chose to land vaguely in the middle of two relatively extreme positions, leaving the courts with the task of considering the facts of each individual case.  See id. at 34-35.

-12-

were located a significant distance from the airplane; (2) the only activity that remained for them to perform was to pick up their baggage; and (3) they were "free agents roaming at will through the terminal." 545 F.2d 282-83 (quoting Day, 528 F.2d at 33). MacDonald is also inapplicable because it predates Day. As noted, the Eleventh Circuit has affirmatively adopted the Day test in Marotte, and therefore MacDonald's summary application of the Montreal Convention is not persuasive. See Marotte, 296 F.3d at 1260. Moreover, the Day Court explicitly distinguished MacDonald by noting that the plaintiff in that case was not acting "at the direction of the airlines" and was "free to move about the terminal." Day, 528 F.2d at 34 n.8. At the time of her accident, the plaintiff in MacDonald was located in the public baggage claim area. See MacDonald, 439 F.2d at 1404. Notably, the Plaintiff also fails to address, much less distinguish, any of the cases cited by the Defendants which strongly suggest that the Montreal Convention should apply.

As to Defendant Miami-Dade County, the Montreal Convention only governs carriers. Thus, because the County is not a carrier, it cannot be held liable where an action falls within the Convention's purview. Montreal Convention, ch. III. In Buchbinder v. American Airlines, Inc., this Court granted summary judgment for a defendant who was not a carrier because it determined that Article 17 of the Warsaw Convention applied. See Case No. 01-3055-CIV-KING, 2002 WL 750838, at *1-2 (S.D. Fla. 2002). Judge King wrote, "The Warsaw Convention is Plaintiff's exclusive remedy, and Plaintiff's state law claims against Defendant Sky Chefs must fail." Id. at 2 (citing Tseng, 525 U.S. at 161). Therefore, so long as the Montreal Convention applies, Miami-Dade County cannot be held liable and no further analysis is required as to that Defendant.

*C. ACCIDENT REQUIREMENT*

***i. Whether an "Accident" Occurred***

-13-

The Court finds that the Montreal Convention applies to the injury in question because the Plaintiff was disembarking.  Therefore, the Court must then determine whether the injury qualifies as an "accident."[5]  The United States Supreme Court has pronounced the controlling interpretation of the term "accident" as follows:

> Liability under Article 17 of the Warsaw Convention arises only if a passenger's injury is caused by an **unexpected or unusual event or happening** that is **external to the passenger**.  This definition should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries.

Air France v. Saks, 470 U.S. 392, 405, 105 S.Ct. 1338 (1985) (emphasis added).[6]  The Supreme Court further held that "the 'accident' requirement . . . involves an inquiry into the nature of the event which caused the injury rather than the care taken by the airline to avert the injury."  Saks, 470 U.S. at 407.

In Sethy v. Malev-Hungarian Airlines, the court found that tripping over luggage left in the aisle during boarding did not qualify as an "accident" because there was nothing "unexpected or unusual" about a bag found in an aisle during the boarding process.  Case No. 98 Civ. 8722(AGS), 2000 WL 1234660, at *4 (S.D.N.Y. 2001), aff'd 13 F. App'x 18 (2d Cir. 2001).  Similarly, in Rafailov v. El Al Israel Airlines, Ltd., the court ruled that there was no Article 17 "accident" where a passenger slipped on a plastic blanket bag underneath a seat during a flight.  Case No. 06 Civ. 13318 (GBD), 2008 WL 2047610, at *2 (S.D.N.Y. 2008).

_____

[5] The term "accident" is commonly used by courts. However, in the context of the Montreal Convention, it has a specific defined meaning.  To the extent that the Court uses the term "accident" in reference to issues outside of the Montreal Convention, the meaning is not equivalent to the treaty term and shall not be designated with quotation marks.

[6] Courts have occasionally added the requirement that the "accident" relate to the "operation of an aircraft." However, this requirement has no foundation in the Warsaw Convention.  See Gezzi v. British Airways PLC, 991 F.2d 603, 605 n.4 (9th Cir. 1993).

On the other hand, being stuck by a hypodermic needle protruding from an airplane seat would constitute an "unusual, unexpected departure from ordinary procedures." Waxman v. C.I.S. Mexicana De Aviacion, S.A. De C.V., 13 F. Supp. 2d 508, 512 (S.D.N.Y. 1998).  So too would being bombarded by liquor bottles falling out of an open overhead compartment.  Maxwell v. Aer Lingus, Ltd., 122 F. Supp. 2d 210, 212-13 (D. Mass. 2000).  Interestingly, in Wipranik v. Air Canada, the court ruled that a "jolt" from a seat passenger in front of the plaintiff, which caused the tray table to shake and tea to spill on the plaintiff, constituted an "accident."  Case No. CV 06-3763 AHM (AJWx), 2007 WL 2441066, at *5 (C.D. Cal. 2007).

The Supreme Court has also ruled that rejection by airline personnel of an explicit request for assistance would be an unusual event that would satisfy Article 17.  Olympic Airways v. Husain, 540 U.S. 644, 646, 124 S.Ct. 1221 (2004).  In Gezzi v. British Airways, PLC, the passenger's slip and fall injury on the landing stairs was caused by two "accidents" according to the district court – water on the stairs to the airplane and the flight attendant's refusal to assist him down the staircase. See 991 F.2d 603, 604 (9th Cir. 1993) (per curiam).[7]

In the Southern District of Florida, another court has found that a plaintiff's fall on aircraft stairs, allegedly caused by "the combination of his being directed to return his luggage to check plane-side and the touching by the flight attendant that caused him to lose his balance," would constitute an "accident." McCarthy v. Am. Airlines, Inc., Case No. 07-61016-CIV-COHN, 2008 WL 2704515, at *5 (S.D. Fla. 2008).

### ii. Application – There Was No Accident

The Court finds that the Plaintiff has failed to establish that an "accident" occurred, which

---

[7] The Ninth Circuit only reached the issue of water on the stairs in finding that an "accident" occurred. Gezzi, 991 F.2d at 605.

is an essential element of a claim under Article 17 of the Montreal Convention.  See Tseng, 525 U.S. at 162; Saks, 470 U.S. at 406-407 (finding the plaintiff's burden of establishing that an "accident" occurred was an indispensable element for the imposition of liability under the Montreal Convention).  The Plaintiff's fall on the escalator did not constitute an "accident."

First, in her Response to the Motion to Dismiss, the Plaintiff failed to counter the Defendant's argument that no "accident" occurred.  The Plaintiff was required to establish an "accident," as such proof is integral to recovery under the Montreal Convention.  According to Federal Rule of Civil Procedure 56(e), the non-movant's "response . . . must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Failure to do so will result in summary judgment against the non-movant.  Id.; see also Celotex, 477 U.S. at 323 (If the non-movant fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment for the movant is "mandated."); Delandro v. Jackson Mem'l Hosp., Case No. 99-2625-CIV-BROWN, 2001 WL 1622064, at *4 (S.D. Fla. Oct. 18, 2001) ("Plaintiff has failed to respond to [an] argument, and therefore the Court finds that the County is entitled to summary judgment on [that] claim."); Daniels v. All Steel Equip., Inc., 590 F.2d 111, 114 (5th Cir. 1979) ("[W]e affirm without hesitation the granting of summary judgment where the nonmoving party makes no effort to fill the holes left in his case by the opposing party's motion.").  The Court therefore rules that summary judgment shall be granted as to the issue of whether there was an "accident," and the Plaintiff's recovery under the Montreal Convention is foreclosed.

On the merits, there is simply no evidence whatsoever that an inoperable escalator is an "unusual or unexpected event" sufficient to constitute an "accident."  The inoperability of an

-16-

escalator bears more similarity to a case of luggage in the aisle or a slippery plastic bag under a seat than to a hypodermic needle protruding from a seat or liquor bottles raining down from an overhead compartment.  Though Wipranik gives some pause, the Court is persuaded to distinguish that case because the "jolt" of the passenger's tray table was the unequivocal cause of the "accident" in question.  See 2007 WL 2441066, at *5.  In this case, there were no foreign substances on the stairs, jostling passengers or other direct outside influence that caused the Plaintiff's fall apart from her own decision to climb an acknowledged inoperable escalator.  In Gezzi and McCarthy, both of which deal with stairs, an outside force at least allegedly caused the plaintiffs' respective falls.  991 F.2d at 604; 2008 WL 2704515, at *5.

The MacDonald court found that there was no "accident" when the plaintiff fell at the baggage claim because "it would [have been] speculation to say that it was the bag which caused the fall."  439 F.2d 1402, 1404-05.  The court ruled: "On the facts established it seems as reasonable to suppose that some internal condition was the cause of the fall as that the fall was the result of an accident."  Id. at 1405.  The Court finds likewise in this case.  Moreover, the Court rules that it would be speculation to say that the Defendants were responsible for the escalator's stationary status.  The record indicates that anyone could simply turn it off by the press of a button.  (Stiles Dep. 117:10-18.)  In addition, it would be speculation to say that the it was the escalator's stationary status that caused the Plaintiff's fall because there is no evidence that she would not have walked up the escalator even if it had been operating, particularly if passengers behind her were urging her to move faster.  See Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("Conclusory allegations without specific supporting facts have no probative value.").  Therefore, the Court finds that a nonoperational or stopped escalator, standing alone, is not reasonably considered an "unusual or

unexpected event" constituting an "accident" under the Montreal Convention.

### D.  LIMITATION ON DAMAGES

Though the Court has found no "accident" in this case, if the Montreal Convention applies

and an "accident" were actually found to have occurred, then carriers are essentially held liable for

proven damages up to "100,000 Special Drawing Rights."  See Montreal Convention, art. 21.  This

amounts to approximately $135,000.  Montreal Convention, Letter of Transmittal to the Senate,

President William J. Clinton, Sept. 6, 2000.  However, if damages arising under Article 17 are "not

due to the negligence or other wrongful act or omission of the carrier or its servants or agents," then

carriers are not liable over that amount.  Montreal Convention, art. 21.  This provision of the

Montreal Convention diverges from the Warsaw Convention and imposes a new legal standard for

damages above the Special Drawing Rights.  See Kruger v. United Airlines, Inc., 481 F. Supp. 2d

1005, 1008 (N.D. Cal. 2007).

In addition, the exoneration provision in Article 20 reads as follows:

> If the carrier proves that the damage was caused or contributed to by the negligence
> or other wrongful act or omission of the person claiming compensation, or the person
> from whom he or she derives his or her rights, the carrier shall be wholly or partly
> exonerated from its liability to the claimant to the extent that such negligence or
> wrongful act or omission caused or contributed to the damage. When by reason of
> death or injury of a passenger compensation is claimed by a person other than the
> passenger, the carrier shall likewise be wholly or partly exonerated from its liability
> to the extent that it proves that the damage was caused or contributed to by the
> negligence or other wrongful act or omission of that passenger. This Article applies
> to all the liability provisions in this Convention, including paragraph 1 of Article 21.

Thus, if the negligence of the injured party actually caused the injury in question, then the court shall

wholly or partially exonerate the carrier.  Montreal Convention, art. 20; see also Saks, 470 U.S. at

407.  As described in greater detail below (infra Section V.), the Court finds that it was wholly the

Plaintiff's negligence that caused this injury, and she is therefore not entitled to recovery under the Montreal Convention based on articles 20 and 21.  Under the same reasoning, she would not be able to recover at all even if the Montreal Convention did not apply.


## V.  NEGLIGENCE

### A.  BACKGROUND

To sustain a cause of action for negligence, "the burden of proof is on the plaintiff to establish that: (1) the defendant had a duty to protect the plaintiff; (2) the defendant **breached that duty**; and (3) the defendant's breach was the **proximate cause of the plaintiff's injuries** and resulting damages."  See Cooper Hotel Servs., Inc. v. MacFarland, 662 So. 2d 710, 712 (Fla. Dist. Ct. App. 1995) (citation omitted) (emphasis added).  The Plaintiff has failed to show a breach in the duty to protect or that the Defendant's breach was the proximate cause of the Plaintiff's injury. Moreover, the Plaintiff has failed to show that a dangerous condition even existed.

### B.  DUTY TO PROTECT

### i.  Law

To show a breach of the duty to protect, a plaintiff must show that the defendant "failed to maintain its property in a reasonably safe condition, or that it failed to warn the plaintiff of a concealed peril of which it either knew or should have known and which could not have been discovered by the plaintiff through the exercise of ordinary care."  Cooper Hotel, 662 So. 2d at 712 (citation omitted); see also Joseph's Hosp. v. Cowart, 891 So. 2d 1039 (Fla. Dist. Ct. App. 2004). Regarding the warning requirement, a defendant must "give timely notice of latent or concealed perils which are known or should be known."  Hylazewski v. Wet'N Wild, Inc., 432 So. 2d 1371,

1372 (Fla. Dist. Ct. App. 1983) (citation omitted).

However, even if a condition qualifies as dangerous under the standard, the plaintiff still has to show actual or constructive notice that the defendant knew or should have known of it. "The plaintiff bears the burden of proving that the defendant was negligent, and to that end, the plaintiff must generally prove that the owner of the premises had actual or constructive notice of the dangerous condition." Lester's Diner II, Inc. v. Gilliam, 788 So. 2d 283, 286 (Fla. Dist. Ct. App. 2000) (citation omitted). In Lester's Diner, the appellee failed to prove this requirement as it related to a substance on the floor that caused a slip and fall injury. 788 So. 2d at 286. The Lester's Diner Court relies on Winn-Dixie Stores, Inc. v. Mazzie in ruling that a "premises owner is not liable for injuries sustained by invitees who slip and fall as a result of a foreign substance on the floor when the invitee provides no competent evidence of actual or constructive knowledge by the premises owner of the dangerous condition." Id.  (citing Winn-Dixie, 707 So. 2d 927, 929 (Fla. Dist. Ct. App.), rev. denied, 725 So. 2d 1109 (Fla. 1998))

### iv.  Application - Reasonable Safety and No Notice

The Plaintiff fails to prove that the Cooper Hotel standard was not met in several ways.  First, the Plaintiff provides no evidence that reasonable care was not used in maintaining its premises in a reasonably safe condition.  In this case, there was no defect in the escalator that resulted in injury. It was turned on after the incident and found to be working properly.  Furthermore, there is no locking mechanism in place to prevent the escalator from being turned off, which means that anyone could have stopped it.  More importantly, the Plaintiff does not offer evidence that the stairs were uneven at the base, that they were wet, that they were overcrowded, or that there was any other significant unsafe condition that caused her to fall.  The extent of the Plaintiff's complaint is that the

escalator steps are slightly steeper (or taller) and somewhat sharper at the edges than regular stairs and that they have grooves that may have caused her rolling bag to get caught.[8]  However, these characteristics alone do not suggest that the escalator in question was unreasonably unsafe.

Even if the inoperable escalator qualified as dangerous, which the Court finds is not the case, the Plaintiff has provided no evidence of "actual of constructive notice." Lester's Diner, 788 So. 2d at 286.  Courts have held that defendants were not liable even for escalator **malfunctions** when there was no evidence that they knew or should have known about the problem.  See Gardner v. MGM Grand Detroit, L.L.C., Case No. 255360, 2006 WL 168023, at *1-2 (Mich. Ct. App. Jan. 24, 2006); Walbridge v. City of Detroit , Case No. 214007, 2000 WL 33529757, at *3 (Mich. Ct. App. March 3, 2000) ("[P]laintiff could present no evidence of [the] defendants' negligence with regard to the escalator. There was no record defendants knew of the problems with the escalator.").  In this case, the Defendants offered evidence that their employees were not required to check escalators when inspecting the sterile doors.  (See Haymes Dep. 31:10-33:13.)  Moreover, the employees do not necessarily see the escalators while they are performing their duties.  The Plaintiff's reliance on photographs of the scene does not provide adequate refutation.

The Plaintiff has not specifically sought to rely upon *res ipsa loquitur*, but the Court finds that a brief discussion is merited because of the notice issues raised in this case.  *Res ipsa* is an evidentiary rule that provides an injured plaintiff with a common-sense inference of negligence where direct proof of negligence is wanting.  Goodyear Tire & Rubber Co. v. Hughes Supply, Inc., 358 So. 2d 1339, 1341 (Fla. 1978).  If the conditions of *res ipsa* are established, actual or constructive notice to a defendant of any defect in the instrumentality is immaterial.  Burns v. Otis

---

[8] Whether or not her bag actually got caught is unclear.  See *infra* note 11.

Elevator Co., 550 So. 2d 21, 21 -22 (Fla. Dist. Ct. App.–3d 1989).

One of the requirements for *res ipsa* to apply is that the accident must not have been due to the plaintiff's voluntary actions.  Colmenares Vivas v. Sun Alliance Ins. Co., 807 F.2d 1102, 1107 (1st Cir. 1986).  In this case, the Court has found that the accident was due to the Plaintiff's own decision to climb the non-moving escalator.  Another requirement is that "the accident must be such that in the light of ordinary experience it gives rise to an inference that someone has been negligent." *Id.* at 1105 (citation omitted).  There is no inference of negligence here because the Plaintiff has "shown nothing more than that [she] had been injured on the escalator," and "based on this fact alone it would not be likely that someone other than the [Plaintiff] had been negligent." *Id.*  Furthermore, there is no evidence in this case that the reason for the escalator's stoppage was the Defendants.  The stop button is not locked, so anyone near the escalator could turn it off if they chose to do so.  See Ebanks v. N.Y. City Transit Auth., 512 N.E.2d 297, 298 (N.Y. 1987) (mem.) (finding that evidence did not adequately refute the possibility that the [injury-causing] escalator . . . had been damaged by a member of the public . . . .); accord Dermotossian v. N.Y. City Transit Auth., 492 N.E.2d 1200, 1205 (N.Y. 1986).

## C.  PROXIMATE CAUSE

### i.  Law

Florida courts follow the "but for" causation-in-fact test as to injuries that do not result from separate concurrent causes.  Stahl v. Metro Dade County, 438 So. 2d 14, 18 (Fla. Dist. Ct. App.–3d 1983) (citation omitted).  To constitute proximate cause, there must be such a "natural, direct, and continuous" sequence between the negligent act and the plaintiff's injury that it can reasonably be said that but for the negligent act, the injury would not have occurred. *Id.* at 17.  Negligence may

not be inferred from the mere existence of an accident alone.  Cooper Hotel, 662 So. 2d at 712

(citation omitted); see also Fuller v. Wurzburg Dry Goods Co.,158 N.W. 1026, 1026 (Mich. 1916)

(In an escalator malfunction case, the Court found: "[B]efore th[e] inference of negligence can be

drawn, something more must be shown than the mere happening of the accident.  In this case there

was no testimony, direct or indirect, as to any negligence in the construction or in the operation of

the stairway.").  "Merely to show a connection between the negligence and the injury is not sufficient

to establish liability."  Salinetro v. Nystrom, 341 So. 2d 1059, 1061 (Fla. Dist. Ct. App.–3d 1977).

***i.  Application - No Proximate Cause***

There is not such a natural, direct and continuous sequence between the allegedly negligent

act and the Plaintiff's injury that it can reasonably be said that but for the act, the injury would not

have occurred.  See Stahl, 438 So. 2d at 17.  The Plaintiff chose to climb an inoperable escalator,

which she knew to be inoperable immediately before ascending, and then attempted to lift and carry

her heavy rolling bag rather than drag it step by step.[9]  In Medina v. American Airlines, Inc.,

Magistrate Judge Brown determined that the plaintiff had knowingly attempted to pick up a hot cup

of coffee and drink it when he could have put it back on the tray to cool down.  The court concluded

that "American met its burden of proving not only that Dr. Medina was comparatively negligent in

causing the accident, but he was the sole proximate cause of same. . . ."  Case No. 02-22133-CIV-

BROWN, 2006 WL 3663692, at *2 (S.D. Fla. Nov. 14, 2006).  Similar to Medina, the Plaintiff here

was the sole proximate cause of her own injury under the negligence standard because of her choice

to climb the non-moving escalator unassisted.  As previously noted, the Plaintiff cannot show that

---

[9] The Plaintiff was also wearing two- to three-inch thick backless wedge sandals at the time, which one witness who arrived at the scene of the incident surmised "would be like walking on stilts."  (Janiszewski Dep. 81:4-9.)

she would not have made the same choice even if the escalator were operational, particularly if the people behind her were urging her onward. Furthermore, despite the Plaintiff's claim that she did not see the elevator, the uncontroverted evidence shows that other means of egress were readily available. A regular staircase as well as an elevator were located in close proximity to the escalator at issue. Plaintiff offers nothing substantial to contradict the evidence that the elevator was in plain sight.

In an effort to prove causation, the Plaintiff argues that the Defendant "required" the Plaintiff to ascend the non-moving escalator. Specifically, the Plaintiff argues that, at the point she realized the escalator steps were not moving, she had "no other alternative" but to proceed up the steps due to the "many people behind her headed in the same direction." (Pl.'s Response 10.) There is no actual evidence on record to suggest that the Defendants "forced" the Plaintiff to ascend the escalator. She does not claim, much less provide evidence, that the Defendants were represented in some way by the "many people behind her" who supposedly forced her up the escalator. Furthermore, the Plaintiff has provided no proof (and only vague inferences) of negligence to the effect that American Airlines allowed the escalator to become overcrowded. See Jokelson v. Allied Stores Corp., 31 A.D.2d 200, 202 (N.Y. App. Div. 1968). In Weiner v. May Dept. Stores Co., there was testimony that there was "quite a line of people" behind the plaintiff, but no evidence that anyone pushed or passed her on the escalator. 35 F. Supp. 895, 897 (D.C. Cal. 1940). The court found that the crowd was "not unruly" and that there was "no hilarity" or evidence of "pushing or any commotion of any sort." Id. Significantly, the court ruled as follows: "The defendant is not liable for the acts of a third person over whom it has no control, or conduct of invitees on its premises who are not unruly, crowding and pushing others, where there is no showing that the

-24-

defendant knew, or under the circumstances should have known, or should have anticipated, that crowd would become unruly." *Id.* (citation omitted). The Court finds likewise in this case.

The fact that an American or Airport employee told her to head up the "escalera" to reach customs and "someone" told her to keep moving ahead when she actually reached the escalator does not satisfactorily prove that she was required to use the escalator at all, much less by the Defendants. Had any American or Airport employees actually forced or ordered her to climb the escalator, the Plaintiff could possibly prove causation. However, as the record stands, there is simply no evidence to support that claim.

## D. DANGEROUS CONDITIONS AND THE OPEN AND OBVIOUS DOCTRINE

### i. Law

In Florida, if an alleged danger is open and obvious enough, it does not consist of a dangerous condition as a matter of law. "An owner is entitled to assume that the invitee will perceive that which would be obvious to him upon the ordinary use of his own sense[s], and is not required to give the invitee notice or warning of an obvious danger." Crawford v. Miller, 542 So. 2d 1050, 1051 (Fla. Dist. Ct. App.–3d 1989) (citations omitted). "Some conditions are simply so open and obvious, so common and so ordinarily innocuous that they can be held as a matter of law to not constitute a hidden dangerous condition." Potash v. Orange County Lake Country Club. Inc., Case No. 6:03CV1652ORL18KRS, 2005 WL 1073926, at *2 (M.D. Fla. 2005) (quoting Circle K. Convenience Stores Inc. v. Ferguson, 556 So. 2d 1207, 1208) (Fla. Dist. Ct. App. 1990)); accord Aventura Mall Venture v. Olson, 561 So. 2d 319, 321 (Fla. Dist. Ct. App.–3d), rev. denied, 574 So. 2d 142 (Fla. 1990).

Florida courts have found open and obvious conditions that did not constitute hidden dangers

on a number of occasions.  The Supreme Court of Florida has held as a matter of law that a difference in floor levels, even in dim lighting, is not an inherently dangerous condition requiring a duty to warn.  Schoen v. Gilbert, 436 So. 2d 75, 76 (Fla. 1983); see also Bowles v. Elkes Pontiac Co., 63 So. 2d 769, 772 (Fla. 1952); Matson v. Tip Top Grocery Co., 9 So. 2d 366, 368 (Fla. 1942); Hoag v. Moeller, 82 So. 2d 138, 139 (Fla. 1955) ("[N]o one entering a home can assume that the floors of all rooms in the same story have the same level, blindly travel on the presumption, disregard his own safety, stumble, fall, and recover.").  The Supreme Court of Florida has even ruled that multiple floor levels in an overcrowded room does not constitute an inherently dangerous condition. Casby v. Flint, 520 So. 2d 281, 282 (Fla. 1988) ("They are so commonplace that the possibility of their existence is known to all.").  Further, the court ruled that warning of such conditions "goes beyond the duty of reasonable care owed to the invitee." *Id.*

The court in Circle K found that a directed verdict was proper where a patron was injured stubbing her toe on a raised concrete platform surrounding a gasoline pump because it was so open and obvious.  556 So. 2d at 1208.  In Potash, the plaintiff fell over a tree stump that he testified was "visible" and "protruding" from the grass on a golf course.  2005 WL 1073926, at *2.  The Court found that the stump was "open to observation by Plaintiff in the exercise of due care." *Id.*, citing Cooper Hotel, 662 So. 2d at 712.  Likewise, in Cooper Hotel, the court found that the plaintiff offered no evidence that the defendant hotel failed to properly maintain a bathtub in which the plaintiff fell, that the tub was otherwise unreasonably dangerous, or that the hotel failed to warn the plaintiff of a concealed peril of which it knew or should have known.  Cooper Hotel, 662 So. 2d at 713.  Essentially, the plaintiff showed only that she fell in the tub, not why she slipped. *Id.*

In Prager v. Marks Bros. Co., the plaintiff slipped on dirt as she was walking in a large

curbside flowerbox.  483 So. 2d 881, 881 (Fla. Dist. Ct. App.–3d 1986).  The court held that "[t]he record affirmatively demonstrates that the unfinished flowerbox did not represent, in any sense, a dangerous condition for which a warning, as urged, was necessary." *Id.*  Thus, summary judgment was appropriate.  *Id.*  The court in Taylor v. Universal City Property Management encountered a "glaringly open and obvious obstacle" when the plaintiff encountered a six-foot diameter planter with palm tree in the middle.  779 So. 2d 621, 622 (Fla. Dist. Ct. App. 2001). The court held: "[A]nyone who walks into a planter containing a Washington palm, greenery and/or flowers and dirt is held to know that this is a hazard to walking.  The precise nature of the hazard need not be observable.  Such a change in level caused by the change in materials and surface texture and the effect on footing is to be expected." *Id.*  Further, the court ruled that, "[h]aving ample notice of an open and obvious hazard, the plaintiff cannot blame the defendant for her fall." *Id.*

In Aventura Mall, the plaintiff alleged that an inherently dangerous condition existed because the color of a curb blended in with the driveway below and concealed the existence of a step down. 561 So. 2d at 320.  The Olson Court found as a matter of law that the plaintiff's claim was without merit and that the curb in question was not a concealed or latent danger.  *Id.* at 320-321. Interestingly, the plaintiff had argued that she did not even see the condition and the court still ruled against her.  *Id.* at 321; contrast Krol v. City of Orlando  778 So. 2d 490, 493 (Fla. Dist. Ct. App. 2001) ("The open storm water drain which caused [the plaintiff's] injury is steeply sloped at the spot where a pedestrian would step from the sidewalk to the roadway. The slope of this particular area leads directly into the drain opening and presents a much different and more potentially dangerous condition than common sidewalk curbs or uneven floor levels in homes, parking lots or public places of business.").

### iii.  Application - Inoperable Escalators are not Hazardous

The Plaintiff's allegations concerning the escalator on which she fell are pervaded with the descriptors "dangerous" and "hazardous."  Yet, the evidence offered by the Plaintiff to prove such danger is virtually nonexistent, despite her attempt to elicit testimony to that effect from the closest thing to an escalator expert there is in this case.[10]  Knowledgeable witnesses provided testimony that they have seen people walking up inoperable escalators and that they did not believe it was dangerous or should be forbidden.  (See Boone Dep. 68:2-10, 84:1-17; Haymes Dep. 74:12-20; 76:4-9; see also Stiles Dep. 113:10-18.)  The Plaintiff provides no counterevidence, expert or otherwise, as to the dangerous nature of climbing a stationary escalator.

Nothing in the record points to any abnormality surrounding the escalator.  For instance, there is no evidence suggesting that the inoperable escalator presented an optical illusion effect whereby it looked like it was moving or that the stairs were hidden.  Contrast Kupperman v. Levine, 462 So. 2d 90, 91 (Fla. Dist. Ct. App. 1985); see also Allen v. Young, 807 So. 2d 704, 705-706 (Fla. Dist. Ct. App. 2002) (affirming summary judgment against the plaintiff, who fell due to a change in elevation between a patio deck and pool area, because "there was no proof that the change in floor levels here created an optical illusion, nor was there proof of an uncommon design or mode of construction."); Rosenfeld v. Walt Disney World Co., 651 So. 2d 811, 812 (Fla. Dist. Ct. App. 1995) (finding that a change in elevation between painted curb and street located in an amusement park that

---

[10]  Witness Hallet Stiles, an engineer and elevator contract specialist, did testify that an escalator is not a legal stairway according to the building code and that when one is out of order at the airport, the maintenance company will cordon it off.  (Stiles Dep. 111:10-23.)  He also personally recommended cordoning off an escalator that was not working.  (Stiles Dep. 112:6-11).  Nevertheless, the Plaintiff failed to elicit any testimony about any actual danger of using an inoperable escalator that is relevant to this case, apart from the height difference between escalator stairs and regular stairs.  (See Stiles Dep. 113:24-114:21; 116:9-17.)  Stiles also stated with regard to cordoning off an escalator that he did not "know [it] to be a requirement," nor if it were a requirement, whose it would be.  (Stiles Dep. 119:14-120:8.)  Moreover, Stiles also stated that he personally had "bounded up many escalators" and that it "never bothered [him]."  (Stiles Dep. 113:10-18.)

allegedly created an "optical illusion of flatness" was still an open and obvious hazard for which summary judgment was appropriate). The only evidence the Plaintiff points to is the incident of her own fall. See Cooper Hotel, 662 So. 2d at 713. Therefore, it is simply not plausible to say that a non-moving escalator is a concealed peril.

To the extent that the escalator could be considered a hazard at all, the Defendants were not required to give notice or warning of the escalator's inoperability. See Crawford, 542 So. 2d 1051. The Court finds that the Plaintiff "had the duty to use ordinary care for [her] own safety and to look and see where [she was] going" and that she "cannot blame the [Defendants] for her fall." Bowles 63 So. 2d at 772; Taylor, 779 So. 2d at 622. In effect, the Court concludes that the escalator, standing alone, was "simply so open and obvious, so common and so ordinarily innocuous" that it did not constitute a hidden dangerous condition as a matter of law. See Potash, 2005 WL 1073926, at *2 (citation omitted). Though the evidence shows that the Plaintiff actually saw that the escalator was not moving before she ascended it, even if she claimed that she had not, it would not have changed the Court's decision. See Olsen, 561 So. 2d at 321; Casby, 50 So. 2d at 282.

In fact, common sense dictates that, to the extent escalators could be considered dangerous, they are more dangerous when they are operational than when they are not moving. As noted, when escalators are stationary, they are simply rendered stairs. The Second Circuit has explicitly found that an immobile escalator was "analogous to a stairway." Dorrian v. Caldor Corp., Case No. 97-7106, 1998 WL 279429, at *2 (2nd Cir. 1998) ("[R]egardless of the substantial harms that may stem from an escalator's mechanical failures, stationary escalators do not present similar dangers. A person using a stationary escalator does not wager his or her safety on the escalator's proper functioning to the same extent as a person using an elevator."). Functional escalators, on the other

hand, are large mechanical constructs with a number of fast-moving parts.  Stairs and inoperable escalators do not present corresponding dangers of: choking people whose clothes get caught in the mechanisms; inducing riders to fall after stopping or jerking suddenly; causing loss of balance when the steps move and the handrail does not, or vice versa; or getting appendages caught between treads (and perhaps amputated). See Rickey v. Chicago Transit Authority, 457 N.E. 2d 1 (Ill. 1983); Otis Elevator Co. v. Chambliss, 511 So. 2d 412 (Fla. Dist. Ct. App. 1987); Roffman v. Sears, Roebuck & Co., 522 So. 2d 31 (Fla. Dist. Ct. App. 1987); O'Day v. Sakowitz Bros., 462 S.W.2d 119 (Tex. Civ. App. 1971); Hayes v. Otis Elevator Co. 946 F.2d 1272 (7th Cir. 1991); Ludgin v. John Hancock Mutual Life Ins. Co., 495 N.E.2d 1237 (Ill. Dist. Ct. App. 1986); Jokelson, 31 A.D.2d 200; Hunt v. City Stores, Inc., 387 So. 2d 585 (La. 1980).

## VI.  PROPER AVENUE OF RELIEF

It is compelling to note that the Plaintiff cannot prove she would not have walked up the escalator even if it were moving.  To claim that is mere speculation.  Furthermore, there is nothing notable in the condition of the escalator being immobilized that renders the Plaintiff's claims distinguishable from an identical injury suffered on an operable escalator.  As noted previously, the Plaintiff does not offer evidence that the stairs were uneven at the base, that they were wet, that they were overcrowded, or that there was any other significant unsafe condition that caused her to fall.

With any moving escalator, people will invariably choose to walk up rather than simply ride.  Finding for the Plaintiff under this set of facts would mandate finding that nearly any moving escalator fails the reasonable safety test when someone decides to walk up and falls.  Escalators may not be designed under the same parameters as stairs, but from an objective standpoint they appear

to be made for, and even encourage, walking.  Were they not made for walking as well as riding, then escalator manufacturers presumably would have designed each step to be so tall as to discourage or even completely prohibit walking.  In light of this fact, the Plaintiff's complaint, if valid at all, would properly lie with the design of the escalator itself under products liability law.  As noted, the core of the Plaintiff's complaint concerns the fact that escalators are slightly steeper and somewhat sharper at the edges than regular stairs.  In addition, the metal ridges on the step may have caused the Plaintiff's rolling bag to get "stuck," though her testimony does not conclusively state that her bag got caught, and the pleadings are curiously vague on the issue.[11]

In Florida, a product may be defective by virtue of a design defect, a manufacturing defect, or an inadequate warning.  Jennings v. BIC Corp., 181 F.3d 1250, 1255 (11th Cir.1999).  In the context of products liability, the Florida Supreme Court recognizes that a strict liability theory "may apply to manufacturers, as well as to others in the distribution chain, including retailers, wholesalers, distributors, and, most recently, commercial lessors."  Samuel Friedland Family Enters. v. Amoroso, 630 So. 2d 1067, 1068 (Fla. 1994).  Similarly, a products liability action grounded in negligence must pertain to a manufacturer or other distributor of a product.  See Williams v. Nat'l Freight, Inc., 455 F. Supp. 2d 1335, 1337 -38 (M.D. Fla. 2006); Pinchinat v. Graco Children's Prods., Inc., 390 F. Supp. 2d 1141, 1149 (M.D. Fla. 2005); Liggett Group Inc. v. Engle, 853 So. 2d 434, 467 n.46 (Fla. 3d DCA 2003), rev'd on other grounds, 945 So. 2d 1246, 1276-77 (Fla. 2006).  Therefore,

---

[11] In her deposition, the Plaintiff remarked that "with those little canals or ridges in the escalator, the wheels get stuck there very easily." (Espinoza Dep. 84:5-7).  Later, she stated that her "little bag would get stuck because of these cracks here" and that when she tried to pull it, "it was as if it had gotten stuck there." (Espinoza Dep. 100:15-16, 21-22.)  The Court notes that the Plaintiff never definitively stated that her wheels got stuck, and there is no other evidence suggesting that her wheels got stuck.  Moreover, when she was asked about the wheels on her bag, the Plaintiff indicated that they were three to four inches thick. (Espinoza Dep. 84:3-7.)  This appears to foreclose the possibility of her bag getting caught in the grooves of the escalator step.  Regardless, since this particular issue ultimately resonates in products liability, it is not relevant to the case at hand.

whether a plaintiff proceeds under a negligence theory or a strict liability theory of products liability, the proper defendants are the manufacturers and perhaps other persons in the chain of distribution.

It would be the duty of the manufacturer to design a safer escalator or equip an escalator with warning labels to indicate that walking constitutes an improper use that may result in injury. See Stanley Indus., Inc. v. N.M. Barr & Co., 784 F. Supp. 1570, 1575-76 (S.D. Fla. 1992). This places the onus on the manufacturer or another person in the chain of distribution for a defectively designed product. Thus, the proper party for the Plaintiff to sue would have been the manufacturer or seller of the escalator. Because neither could be said to be involved in the chain of distribution of escalators, both of the Defendants are granted summary judgment on these grounds, which are alternative to those already supplied.

## VII. CONCLUSION

The Montreal Convention applies in this case as the Plaintiff was in the process of disembarking from her international flight when she injured herself. The Plaintiff has not proven that she suffered an "accident" as defined by the Convention. Moreover, she has not proven that the Defendants, rather than her own negligence, caused her fall. Even if the Plaintiff had a valid claim, it would be a products liability case against the manufacturer of the escalator and not these Defendants. Therefore, Summary Judgment is **GRANTED** in favor of the Defendants.

DONE AND ORDERED in Chambers at Miami, Florida, this 4th day of September, 2008.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies provided to:

Counsel of Record